UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

       Plaintiff,

v.                             Case No. 13-20755

Ronni Hermiz (D-1) and          Sean F. Cox
Chris Daniel Korkis (D-2),       United States District Court Judge

       Defendants.
_____/

## OPINION & ORDER

       There are two Defendants charged in this action: 1) Defendant Ronni Hermiz ("Hermiz")

and 2) Defendant Chris Daniel Korkis ("Korkis"). This matter is currently before the Court on

Motions to Suppress filed by Hermiz and Korkis. After the parties initially briefed the issues,

the Court held an evidentiary hearing over the course of several days. The parties then filed

supplemental briefs after the evidentiary hearing concluded. For the reasons that follow, the

Court shall DENY Defendant Korkis's Motion to Suppress because Korkis lacks standing to

challenge a search of the rental car at issue in this case. The Court shall GRANT Defendant

Hermiz's Motion to Suppress and rules that the evidence derived from the warrantless tracking

of his rental car, including the marijuana seized from the Malibu, cannot be used against Hermiz

at trial.

## BACKGROUND

       This action was initiated by a criminal complaint filed on September 16, 2013, alleging

that Defendant Hermiz made false statements in applying for citizenship or naturalization.

1

Hermiz was arrested on September 19, 2013.  Hermiz was indicted on October 15, 2013, with: "Unlawful Procurement of Citizenship," in violation of 18 U.S.C. §1425(a) (Count One); and "Materially False, Fictitious, or Fraudulent Statements," in violation of 18 U.S.C. § 1001(a)(2) (Count Two).  Both charges stem from Hermiz's alleged failure to disclose that he was arrested on July 13, 2011, in connection with an alleged drug conspiracy.

The Government filed a First Superceding Indictment on February 2, 2014, adding Korkis as a Defendant.  It contains the same two counts as to Hermiz, but labels them Counts Two and Three, and adds a new Count One against both Hermiz and Korkis – charging them with conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846 and 841(a).  The conspiracy alleged in Count One is alleged to have involved marijuana and occurred on or about July 13, 2011.

Hermiz filed a Motion to Suppress (Docket Entry No. 40) on April 16, 2014.  Korkis also filed a Motion to Suppress (Docket Entry No. 43) on that same date.

During the investigation underlying this case, law enforcement agents used various investigative techniques.  It is undisputed that they placed a GPS tracking device on a rental car (a white Chevrolet Malibu) that was rented by Hermiz and that they did not obtain a warrant before doing so.  They did that in July of 2011 – before the United States Supreme Court issued *United States v. Jones*, which held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" *United States v. Jones*, __ U.S. __, 132 S. Ct. 945 (2012).

In their motions to suppress, each Defendant asks the Court to suppress evidence based on the warrantless placing of the GPS tracking device on the Malibu.

2

In addition, Defendant Korkis also challenges the physical search of the Malibu while he was driving it on July 13, 2011.

In response to the motions, the Government argues that Korkis lacks standing to challenge a search of the Malibu.  It also argues that the Court should not suppress evidence here even though the officers did not obtain a warrant for the placing of the GPS device on Malibu for the following reasons: 1) a warrant was not required because the "search" was reasonable; 2) even if a warrant is required, the exclusionary rule should not be applied in this case because the agents acted on a good faith understanding of the law, the evidence was sufficiently attenuated from the GPS tracking, and the evidence would have been discovered from an independent source.

With the issues so framed by the parties, this Court held an evidentiary hearing, which proceeded over the course of several days.

 The Government called the following witnesses at the hearing: 1) Shohn Joyner, who at the times relevant to the motions was a U.S. Border Patrol Agent; 2) Glen Lendel, who at the relevant times was Joyner's supervisor at the U.S. Border Patrol; 3) Heath Stevens, a U.S. Border Patrol Agent who operated a stationary camera positioned on the St. Clair river at various times.  Neither Defendant testified during the evidentiary hearing and Defendants presented no other witnesses at the hearing

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard and observed the witnesses who testified at the evidentiary hearing and the other evidence presented, allowing for this Court to assess credibility, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court

3

makes the following findings of fact and conclusions of law.[1]

**FINDINGS OF FACT**

Shohn Joyner ("Joyner") is currently a Special Agent with the United States Drug Enforcement Agency.  In June of 2011, Joyner was employed as a Border Patrol Agent with the United States Border Patrol, Detroit Sector.  While with the Border Patrol Agency, Joyner was the lead case agent for an investigation involving Ronni Hermiz.

That investigation began after Joyner received an Intelligence Report stating that a water craft registered to Raad Hermiz, Ronni's brother, had crossed from the United States to Canada smuggling water pipe tobacco and alcohol into Canada.  Joyner also reviewed a Bulletin issued by the Canadian Border Service regarding the smuggling incident.  That report implicated both Ronni Hermiz and Raad Hermiz.  Joyner then compiled information on Raad and Ronni Hermiz and discovered they each had some criminal history.

Joyner reached out to the Michigan State Police and learned that they had a prior incident where Ronni Hermiz had been located on the border in East China Township, at a vacant home during the winter.  A neighbor had called the police because there had been some type of theft in the area.  When questioned by the police, Ronni Hermiz told them he was looking for a place to fish.  That explanation was not plausible, however, because the water was frozen and Ronni Hermiz had no fishing equipment with him.  The event struck Joyner as suspicious because, based on his training and experience, cross-border smugglers typically look for a spot on the river where they will be concealed from law enforcement.

---

[1]To the extent that a finding of fact is more properly a conclusion of law, and the to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

4

During the investigation, Joyner conducted some limited physical surveillance of Raad and Ronni Hermiz and kept a surveillance log.

Joyner learned that Ronni Hermiz lived in a home on Yonkers Drive in Sterling Heights, Michigan. Joyner conducted physical surveillance of Ronni Hermiz at that residence in late June and early July of 2011.

On July 5, 2011, Joyner conducted physical surveillance at the Yonkers home and observed Raad Hermiz there.

On July 6, 2011, Joyner observed a white Chevy Malibu parked at the Yonkers home at approximately 10:30 a.m.  Joyner ran a check on the Malibu and discovered that it was a rental car registered to Avis.  That was significant to Joyner because, in his experience, cross-border criminal activity often involves the use of rental cars.  Joyner saw Ronni Hermiz enter the Malibu and drive away from the Yonkers home.  Joyner, who was in an unmarked patrol vehicle, began conducting rolling surveillance and asked other agents to assist.

As Joyner followed him on July 6, 2011, Ronni Hermiz first stopped at a store that did not have a sign identifying it.  He observed Ronni enter the store, speak with a female, and then leave the store after about 20 minutes, carrying bags marked with the logo from the Nino Salvaggio market on them.  As Ronni left the store, Joyner observed Ronni conduct counter-surveillance. Joyner explained that, in his experience, criminals will drive in a certain manner in order to make sure they are not being followed, doing things like driving too slow in comparison to the speed limit, switching lanes repeatedly, doing abrupt stops, etc.  Joyner later went back to that store the next day and learned that it sold cellular telephones in bulk.  That was significant to Joyner because, in his experience, individuals involved in drug trafficking often use "drop or

5

throwaway phones," which are phones that are inexpensive, used for a month or for a single event, and then discarded.

On July 6, 2011, after leaving the cell phone store, Joyner followed Ronni Hermiz to a hydroponics store in Sterling Heights. Although Joyner saw other customers entering and exiting from the front door, he saw Ronni enter the store through the back door, that appeared to be an employee door. At this time, Joyner was aware that Ronni worked at a party store and had no information as to him being employed by the hydroponics store. Ronni's visit to the store was significant to Joyner because, in his experience, individuals involved in growing marijuana frequent hydroponic stores.

After Ronni Hermiz left the hydroponics store, Joyner followed him to a residence at 5099 Pointe Drive in China Township, Michigan. That raised Joyner's suspicions because Ronni Hermiz lived in Sterling Heights, a significant distance from China Township, and all the records Joyner had reviewed did not show any connection to a China Township address. Joyner learned that the owner of the residence at 5099 Pointe Drive was deceased and that no one was living there at the time. Nevertheless, Joyner observed Ronni Hermiz open the garage and park inside the garage.

The residence at 5099 Pointe Drive is a residential home that has access to the St. Clair River and has a boat well. Canada is on the other side of the St. Clair river.

At this point, Joyner decided to request authorization to place a GPS tracking device on Ronni Hermiz's rented Malibu. He did not seek or obtain a warrant.

Joyner received some on the job training, from other agents, as to how to physically install a GPS tracker on a vehicle. Joyner never attended any classes put on by prosecutors,

6

other counsel, or law instructors regarding GPS trackers.

Joyner did not believe that he was required to obtain a search warrant before placing a GPS tracker on a vehicle.  When questioned by the Court and defense counsel as to why he believed a warrant was not required, Joyner testified that because his training never addressed or discussed whether or not a warrant was required, he assumed that a warrant was not required. Notably, Joyner testified that he had not been instructed or advised by others that he did not need to obtain a warrant.

Joyner testified that he has been involved in other investigations that used GPS trackers on vehicles, wherein someone other than him obtained and placed the tracker, and he does not know if warrants were obtained in those instances or not.

Joyner was not aware of any written policies or guidelines that the Border Patrol had regarding GPS trackers, but there was a request form. Joyner testified that, at that time, the placing of trackers on vehicles in the Detroit Sector was relatively new and that his supervisors did not believe that they should be placing trackers "on every vehicle out there," so a form was to be filled out before a tracker could be used.  That form was only used by the Detroit Sector.

Joyner filled out a form titled "Electronic Tracking Device (ETD) Placement Request Form." (Govt.'s Ex. 1).  On that form, Joyner stated as follows for the "Brief Synopsis:"

> On 6/16/2011, a vessel (MC 9370PW) registered to Raad HERMIZ was used in a Canadian smuggling attempt of water pipe tobacco at Belle River, Ontario, Canada. The vessel was operated by two third party individuals.  Since the seizure of the vessel the registered owner's brother Ronni HERMIZ has been in communication with CBSA attempting to get the boat returned.

> TECS records indicate that the registered owner of the vessel (Raad HERMIZ) was encountered by CBP on 06/23/2003 during and outbound inspection attempting to structure $10,413USD.

7

> Records ran through DEA databases revealed that (Raad HERMIZ) cell phone
> number hit off of numerous toll records on a closed Title III ABOUUD case.

(*Id.*).  On the "Action Plan" portion of the form, Joyner stated:

> DTM SIU will deploy an ETD on the vehicle in order to monitor Ronni
> HERMIZ' movement.  DTM SIU will monitor HERMIZ' [sic] movement which
> will assist in alerting SIU where and when the subject is located near the border.
>
> The ETD will assist SIU with establishing a pattern of life.  Any activity outside
> the pattern of life will be analyzed for further intelligence.  The goal is to assist
> Operations with a cross-border interdiction, with [sic] will provide further
> intelligence.

(*Id.*).  Agent Glenn Lendel, Joyner's supervisor, signed the form on July 7, 2011, the same day it

was submitted, and authorized the use of the GPS tracker on the Malibu that had been rented by

Ronni Hermiz.

The next day, July 8, 2011, Joyner physically placed a GPS tracking device on the

Malibu, while it was parked in the driveway at Ronni Hermiz's residence on Yonkers Drive in

Sterling Heights.

After doing so, Joyner placed a "geo-fence" around the residence on Yonkers.  He also

placed a geo-fence around the Pointe Drive residence, so that whenever the Malibu would get to

a certain point on Interstate 94 heading towards the Pointe Drive residence, Joyner would receive

an electronic notification.

On July 12, 2011, Joyner was at his office at Selfridge when he received a notice, via the

GPS tracking device, that the Malibu was heading to the Pointe Drive residence.  Because he

knew that he could not get there before the Malibu did, Joyner advised his supervisor and other

agents who were in the area of the Pointe Drive residence.  Those agents were in place before the

Malibu arrived at the Pointe Drive residence; Joyner arrived sometime later.  Once the Malibu

arrived, agents from Border Patrol were watching the Pointe Drive residence the entire time, until the arrest the next day.

When the Malibu arrived, it was parked in the garage. At 11:00 p.m., Ronni Hermiz was seen exiting the residence to smoke a cigarette, and then went back inside. Just before midnight, the agents observed a flash of light emanate from the house towards Canada. That was significant to Joyner because, in his experience dealing with cross-border smuggling, a signal is often used to inform the individuals on the Canadian side of the border of where the landing point should be in the United States.

The agents continued to monitor the area. They soon heard and saw a small vessel, a zodiac, in the immediate area.

Joyner observed the vessel approach the dock behind the Pointe Drive residence. Using night vision goggles, Joyner could identify Ronni Hermiz exit the Pointe Drive residence, carrying a small duffel bag that was about a foot long. Ronni Hermiz then approached the vessel that had arrived and returned back to the residence carrying two large duffel bags that were each about two and half feet long. After the exchange of bags, Joyner saw Ronni Hermiz enter the Pointe Drive residence through the side door. The agents continued watching the residence until the next morning.

Early the next morning, the agents observed another car, a dark maroon Dodge Ram truck, arrive at the Pointe Drive residence and pull into the carport area. At 6:20 a.m., the agents observed both the Malibu and the Dodge Ram truck leave the Pointe Drive residence. The two vehicles drove in tandem, with the Malibu slightly ahead of the truck.

At that point, from what he had observed, Joyner believed that a cross-border smuggling

9

event had occurred.  Several agents communicated via telephone and radio and then Joyner ultimately advised agents to stop both the Malibu and the truck.

The Malibu was stopped first, and was stopped by Agent Locke.[2]  It is undisputed that the only reason that Agent Locke stopped the Malibu was because, as a result of the investigation, Joyner had directed the car to be stopped.  Korkis was driving the Malibu at the time it was stopped.  The officers ultimately seized more than 40 pounds of marijuana that was in the Malibu.

Ronni Hermiz was driving the Dodge Ram truck when it was stopped by the officers.  No contraband was found in the truck.

Sometime after July 13, 2011, Agent Joyner learned that Korkis and Hermiz are biologically related as uncle and nephew.

## ANALYSIS & CONCLUSIONS OF LAW

**I.     The Court Shall Deny Defendant Korkis's Motion To Suppress Because Korkis Lacks Standing To Challenge A Search Of The Malibu.**

Korkis's Motion to Suppress asks the Court to suppress evidence derived from the searches of the Malibu in this case.  There were two different searches of the Malibu in the case: 1) the warrantless use of a GPS tracking device on the Malibu to track its movements, which under *Jones* constitutes a search; and 2) a physical search of the Malibu after it was pulled over by Agent Locke on July 13, 2011, at which time more than forty pounds of marijuana was seized.

As a threshold issue, the Government challenges Korkis's standing to challenge a search

---

[2]Agent Locke did not testify at the evidentiary hearing.

of the Malibu.

"A defendant's standing is determined independently from his co-defendant's standing with regard to the same items and places that are searched." *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008). Thus, as Korkis acknowledges, Korkis has the burden of establishing his own standing to challenge any search of the Malibu.

"Because 'the Fourth Amendment protects people, not places,' *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), a defendant has standing to challenge the admission of evidence only if the defendant's own constitutional rights have been violated." *United States v. Davis*, 430 F.3d 345, 359-60 (6th Cir. 2005). "In cases involving Fourth Amendment violations, we determine standing by deciding whether a defendant can establish 'a legitimate expectation' of privacy" in the area or item searched. *Davis*, 430 F.3d at 360 (citations omitted).

This Court has previously addressed the issue of standing to challenge the warrantless monitoring a vehicle via a GPS device. *United States v. Gordon*, 2013 WL 791622 (E.D. Mich. 2013). In *Gordon*, this Court observed that a "defendant who sometimes uses a vehicle, during the course of GPS surveillance, does not establish that the defendant has a reasonable expectation of privacy in the vehicle at all times." *Gordon, supra*, at *5 (citing *United States v. Luna-Santillanes*, 2012 WL 1019601 (E.D. Mich. 2012)). In that case, this Court concluded that two defendants, Gordon and Shivers, lacked standing where the evidence established that they had driven the cars at issue on multiple occasions but there was no evidence that the registered owner of the cars had given them permission to drive those cars. *Id*. at *5-6.

Here, Defendant Korkis has an even weaker argument as to his standing. The only

11

evidence before this Court is that Korkis drove the Malibu on just one occasion – the date of his

arrest on July 13, 2011.  Moreover, this case involves an added twist in that it involves a *rental*

*car* and there is no evidence before this Court to indicate that anyone other than Hermiz was

listed as an authorized driver of that rental car.

In *United States v. Smith*, the Sixth Circuit examined the issue of standing to challenge a

physical search of a rental car.  *United States v. Smith*, 263 F.3d 571 (6th Cir. 2001).  It

explained that "[a]s a general rule, an unauthorized driver of a rental vehicle does not have a

legitimate expectation of privacy in the vehicle, and therefore does not have standing to contest

the legality of a search of the vehicle."  *Smith*, 263 F.3d at 586.  However, the Sixth Circuit

declined to " adopt a bright line test" as to the issue of standing "based solely on whether the

driver of a rental vehicle is listed on the rental agreement as an authorized driver."  *Id.*  The court

went on to consider five factors to consider in determining whether an unauthorized driver of a

rental car has standing to challenge a search of the car: 1) whether the defendant was a properly

licensed driver, who could legally drive the car in question; 2) whether the defendant was able to

present the officer with a rental agreement and provide the officer with sufficient information

regarding the car; 3) whether the defendant driver can identify some related individual who gave

him possession of the vehicle or whether the purported authorized driver is "some unrelated third

party,"; 4) whether the defendant's related party had given him permission to drive the vehicle;

and 5) "most significantly," whether the defendant had a business relationship with the rental

company such as having made a reservation, or presented it with a credit card number.  *Id*. at

586.

"The burden of production and persuasion rests on" Korkis, "the person seeking to

suppress evidence." *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986).  Korkis "could have testified at the suppression hearing in support of his [motion], but did not do so.  Any testimony by [Korkis] at that hearing could not have been admitted as evidence of guilt at the trial." *Id*.

There was no evidence whatsoever presented to this Court as to the first two factors, whether: 1) Korkis was a properly licensed driver on the date in question; and 2) whether Korkis was able to present the officers who stopped him in the Malibu with any information regarding that rental car.

As to the third and fourth factors, there was testimony to indicate that Korkis and Ronni Hermiz are biologically related as uncle and nephew.  Thus, Korkis is not a totally unrelated third-person.  Moreover, although there was no direct evidence that Ronni Hermiz gave Korkis permission to drive the Malibu, it can be inferred from the other facts before the Court (ie., that Ronni Hermiz drove the Malibu to the location and that in leaving the location he followed Korkis in another vehicle).  Thus, these factors weigh in Korkis's favor.

As to the final and "most significant" factor, however, there is no evidence before this Court to establish that Korkis had any kind of business relationship with Avis, the rental company, "such as having made a reservation, or presented it with a credit card number." *Smith*, 263 F.3d  at 586.

Considering the evidence presented at the evidentiary hearing, and all of the above factors, this Court concludes that Korkis has failed to meet his burden of establishing that he has standing to challenge a search of the Malibu.   The Court shall therefore DENY his Motion to Suppress Evidence.

13

**II.      The Court Shall Grant Defendant Hermiz's Motion To Suppress.**

The Government concedes that Hermiz has standing to challenge the warrantless placing of the GPS device on the Malibu he had rented.  The Government argues that the Court should not suppress the evidence seized from the Malibu, even though the officers did not obtain a warrant, for several reasons.

**A.      This Court Rejects The Government's Reasonableness Argument.**

First, the Government argues that the *Jones* Court did not hold that officers must obtain a search warrant before conducting GPS surveillance; it only ruled that the placing of a GPS tracking device constitutes "a search."  The Government notes that the Supreme Court did not address other arguments that had been raised by the Government in *Jones*, including that a warrant was not required because the "search" was "reasonable."  The Government concedes that the installation of a GPS device qualifies as a search but argues that "it was not unconstitutional because the Fourth Amendment only prohibits unreasonable searches" and, the use of the GPS device here was reasonable.  (Docket Entry No. 50).

Citing *Samson*, the Government asserts that its warrantless search here was reasonable under the totality of the circumstances.  "Whether a search is reasonable is 'determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Samson v. California*, 547 U.S. 843, 848 (2006) (quoting *United States v. Knights*, 534 U.S. 112 (2001)).  The Government asserts that "[a]pplying the Court's balancing test to GPS tracking of vehicles on public roads, neither a warrant nor probable cause should be required" and that the "privacy interest, if any, is minimal."  (Govt.'s Br. at 10).

14

This Court disagrees.

Any inquiry into the validity of the search here "must begin with the general rule that warrantless searches and seizures are *per se* unreasonable under the Fourth Amendment.*" United States v. Blue Diamond Coal Co.*, 667 F.2d 510, 518 (6th Cir. 1981) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967) and *Camera v. Municipal Court*, 387 U.S. 523 (1967)); *see also Jacob v. Township of West Bloomfield*, 531 F.3d 385, 392 (6th Cir. 2008) (citations omitted) ("'[I]t is settled . . . that except in certain carefully defined classes of cases, a search of private property without proper consent is unreasonable unless it has been authorized by a valid search warrant.").

A key factor to consider in the balancing inquiry is an individual's status on the "privacy continuum." *United States v. Smith*, 526 F.3d 306, 308 (6th Cir. 2008). At one end of the spectrum are inmates, who have no legitimate expectation of privacy from searches of their prison cells. *Id.* "Probationers have fewer expectations of privacy than free citizens, and parolees have still fewer expectations of privacy than probationers. *Id.* At the other end of the continuum are "free citizens, who enjoy 'absolute liberty.'" *Id.* Notably, Hermiz was not on parole or probation at the time of the search at issue and he is therefore at this end of the continuum and enjoys "absolute liberty."

Moreover, the Court rejects the Government's assertion that the privacy interest at issue here is "minimal." The GPS device used in this case allowed officers to track Hermiz's movements in the Malibu at all times. It is undisputed that the GPS tracking device was placed on Hermiz's car so that the agents could "establish a pattern of life" for Hermiz. (Govt.'s Ex. 1). This kind of surveillance:

reveal[s] more about a person than does any individual trip viewed in isolation. Repeated visits to a church, a gym, a bar, or a bookie tell a story not told by any single visit, as does one's not visiting any of these places over the course of a month. The sequence of a person's movements can reveal still more; a single trip to a gynecologist's office tells little about a woman, but that trip followed a few weeks later by a visit to a baby supply store tells a different story.  A person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups—and not just one such fact about a person, but all such facts.

*United States v. Maynard,* 615 F.3d 544, 562 (D.C. Cir. 2010).

The Court also rejects the Government's argument that "obtaining a warrant before using a tracking device on a vehicle would come at great expense to law enforcement investigations" like the one in this case because it would impede the government's ability to investigate leads. (Govt.'s Br. at 11-12).  "The purpose behind the warrant requirement is to insure that the judgment of a neutral and detached magistrate is imposed against the unbridled discretion of an official caught up in the heat of an investigation."  *Blue Diamond Coal Co.*, 667 F.3d at 518. The facts of this case demonstrate the agents had ample time to seek and obtain a warrant from a judge or magistrate.  The process of seeking and obtaining a warrant would not have unduly impeded this investigation.

Accordingly, the Court concludes that a warrant was required before placing a GPS tracker device on Hermiz's rental car.

### 2.      The Court Rejects The Government's Arguments As To Why The Exclusionary Rule Should Not Apply Here.

Next, the Government argues that the exclusionary rule should not be applied in this case for several reasons.

16

a.    **The Court Rejects The Government's Argument That The Exclusionary Rule Should Not Apply Because The Agents Acted On Their Good Faith Understanding of Law.**

The Government asserts that even if a warrant was required the exclusionary rule should not be applied here because the agents were acting on their good faith understanding of the law when they placed the GPS device on the Malibu.

This is the ground upon which this Court denied motions seeking to suppress evidence gained through the use of warrantless GPS tracking devices in *Gordon.* *See United States v. Gordon*, 2013 WL 791622 (E.D. Mich. 2013). In *Gordon*, this Court ruled that "Special Agent Browne and the task force officers acted in good faith and in objectively reasonable reliance on the advice of counsel in placing the GPS devices on the vehicles" in that case. *Gordon, supra*, at *7. Notably, at the evidentiary hearing in that case, "Special Agent Patrick Browne [testified] that he received advice from legal counsel, as well as his supervisors and other agents, that warrants were not required when the GPS devices were placed on the vehicles in this action. Based on advice from counsel, he and the other task force officers and agents believed that they were acting lawfully in placing the GPS devices on the vehicles in this action without a warrant." *Gordon, supra*, at *6.

Moreover, after this Court issued *Gordon*, the Sixth Circuit issued *United States v. Fisher,* 745 F.3d 200 (6th Cir. 2014). In *Fisher*, the "question presented on appeal [wa]s whether the evidence derived from a warrantless GPS automobile search should be excluded or whether the good-faith exception to the warrant requirement applies." *Id*. at 201. The Sixth Circuit held that "the police had an objectively reasonable good-faith belief that their conduct was lawful and *sanctioned by then binding appellate precedent*, and thus, the exclusionary rule

17

does not apply." *Id*. (emphasis added).

In so holding, the Sixth Circuit noted that "at the time the GPS tracking in the present case took place, every other circuit to have considered the issue had uniformly upheld the constitutionality of the practice." *Id*. at 205.  The court also explained:

> . . .that the officers conducting the search *conformed to the consistent training and advice that they received from federal and state law enforcement authorities. Officers testified at the suppression hearing that they believed their conduct was lawful based upon Drug Enforcement Agency training, police trainings, and conversations with prosecutors*.  The existence of police training indicating that certain conduct is lawful does not make the conduct such, nor does it prevent a court from exercising the exclusionary rule.  A ruling to the contrary would shield officers from punishment even for flagrant misconduct.  But, similarly, *the fact that the officers received consistent advice from multiple authorities that correctly reflected the unanimous understanding of multiple circuit courts should not be ignored*.  It again goes to the broader impression that the officers acted in good faith and in *justifiable reliance upon the training they received.*

*Id.* at 206 (emphasis added).  The court also stated "there is no indication in the present case that the police acted in bad faith or that their conduct was 'deliberate, reckless, or grossly negligent.'" *Id*. The Court then summarized:

> At the time the police placed the tracking device on Fisher's vehicle, *the training and guidance provided to these officers by various police agencies and prosecutors all indicated that such conduct was consistent with the Constitution*; *no circuit authority had indicated that the use of a GPS tracker was unconstitutional, and three circuits had held that such conduct was lawful; the relevant Supreme Court case law had indicated such a practice was lawful; and our precedent also provided binding authority permitting such conduct*.  These are not the type of circumstances that warrant the application of the "bitter pill" that is the exclusionary rule.  As it is apparent that the police acted in reasonable, good-faith reliance and that their conduct was lawful, the exclusionary rule does not apply.

*Id.* (emphasis added).

In this case, however, there is *no credible evidence* that the agents were acting on a good faith understanding of the law when they placed the GPS device on the Malibu without a

warrant.

Unlike the facts in *Gordon* and *Fisher*, the agent who placed the GPS device on Hermiz's rental car without a warrant *had not been given any advice, training, or guidance* from prosecutors or others as to whether a warrant was required before placing a GPS device on a car or the status of the law on this issue.  Agent Joyner's own testimony reflects that: 1) he had never attended any classes put on by prosecutors, other counsel, or law instructors regarding GPS trackers; 2) he had never been instructed or advised by others that he did not need to obtain a warrant; 3) because his training never addressed or discussed whether or not a warrant was required, he simply assumed that a warrant was not required; 4) although he had been involved in other investigations that used GPS trackers on vehicles, wherein someone other than him obtained and placed the tracker, and he does not know if warrants were obtained in those instances or not; and 5) his agency had no written polices or guidelines regarding the use of GPS trackers.

Given these facts, the Court rejects the Government's argument that the exclusionary rule should not be applied here because the agents were acting on their "good faith understanding of the law" when they placed the GPS device on the Malibu.

> **b.**     **The Government Has Not Meet Its Burden Of Proving Attenuation.**

In its opening brief, prior to the evidentiary hearing, the Government also invoked the attenuation doctrine to avoid suppression of the evidence.

The burden of proving attenuation rests with the prosecution.  *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003); *United States v. Lee*, 2012 WL 1880636 at * 7(E.D. Ky. 2012).

In his reply brief, that was filed prior to the evidentiary hearing, Hermiz did not address this argument.  Rather, he asserted that this is a fact-intensive issue and that he would like to file

a brief after the evidentiary hearing.  Accordingly, this Court allowed each party to file a supplemental brief of no more than twenty pages after the evidentiary hearing had concluded.

In its nine-page supplemental brief, the Government did not address attenuation.  As such, it appears that the Government may have abandoned this argument.  But even if it has not abandoned the argument, the Court concludes that the Government has not met its burden of establishing that the doctrine applies here.

"The Supreme Court has explained the attenuation doctrine as follows: 'We need not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police.  Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made had been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the taint.'" *United States v. Fofana*, 666 F.3d 985, 992-93 (6th Cir. 2012) (quoting *Wong Sun v. United States*, 371 U.S 471, 487-77 (1963)). Three factors guide the attenuation analysis: 1) the temporal proximity of the illegality and the emergence of the incriminating evidence at issue; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct.  *Fofana,* 666 F.3d at 993.

The first factor is the temporal proximity of the illegality (the warrantless use of a GPS tracking device on the Malibu) and the emergence of the incriminating evidence at issue (the marijuana that was seized from the Malibu).  This factor "must be considered in light of the conditions and circumstances that occurred during the time frame in question.*" United States v. Shaw*, 464 F.3d 615, 628 (6th Cir. 2006).  In this case, there was no significant lapse in time between the illegal search and the subsequent stop of the Malibu on July 13, 2011.  Those events

were only days apart.  Moreover, while the installation of the GPS device occurred on July 8, 2011, pursuant to *Jones,* both the installation and the use of the device to monitor the vehicle's movements constitute "the search."   In light of the limited temporal proximity between the use the GPS device and the stop and subsequent search of the Malibu, the Court finds that this factor weighs against attenuation.

The second factor is the presence of intervening circumstances.  The Government has not identified any intervening circumstances.  Thus, this factor does not favor attenuation.

The third and final factor is the purpose and flagrancy of the official misconduct.  The Government's argument as to the third factor is the same as its good-faith argument (i.e., there was no flagrant misconduct because the officers had a good-faith belief that their conduct was legal).  As set forth above, in light of the facts of this case, the Court rejects the Government's argument that the exclusionary rule should not be applied here because the agents were acting on their good faith understanding of the law when they placed the GPS device on the Malibu.  This final factor, therefore, also does not favor attenuation.

Accordingly, the Court concludes the Government has not met its burden of proving attenuation.

### c.    The Government Has Not Met Its Burden Of Establishing That The Independent Source / Inevitable Discovery Doctrines Apply.

The "inevitable discovery exception to the exclusionary rule applies when the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered.*"  United States v. Kennedy*, 61

F.3d 494, 499 (6th Cir. 1995) (emphasis in original). That "burden is met if the government shows 'that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence.'" *United States v. Hodge*, 714 F.3d 380, 387 (6th Cir. 2013).

Like attenuation, this argument was raised by the Government in its brief filed prior to the evidentiary hearing. In his reply brief, that was filed prior to the evidentiary hearing, Hermiz asserted that this is a fact-intensive issue and that he would like to file a brief after the evidentiary hearing. Accordingly, this Court allowed each party to file a supplemental brief of no more than twenty pages after the evidentiary hearing had concluded.

In its nine-page supplemental brief, the Government did not address the independent source / inevitable discovery doctrine. As such, it appears that the Government may have abandoned this argument. But even if it has not abandoned the argument, the Court concludes that the Government has not met its burden of establishing that the doctrine applies here.

Accordingly, the Court GRANT Defendant Hermiz's Motion to Suppress and rule that the evidence derived from the warrantless tracking of his rental car, including the marijuana seized from the Malibu, cannot be used against Hermiz at trial.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant Korkis's Motion to Suppress (Docket Entry No. 43) is DENIED because he lacks standing to challenge a search of the rental car at issue in this case.

IT IS FURTHER ORDERED that Defendant Hermiz's Motion to Suppress (Docket Entry No. 40) is GRANTED and the Court RULES that evidence derived from the warrantless

tracking of his rental car, including the marijuana seized from the Malibu on July 13, 2011,

cannot be used against Hermiz at trial.

        IT IS SO ORDERED.

                                        S/Sean F. Cox
                                        Sean F. Cox
                                        United States District Judge

Dated:  August 29, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 29, 2014, by electronic and/or ordinary mail.

                                        S/Jennifer McCoy
                                        Case Manager